**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 06a0630n.06
Filed: August 24, 2006

**Nos. 04-6400, 05-5262, 05-5263, 05-5318**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
|     Plaintiff-Appellee, | ) | |
| v. | ) | |
| | ) | |
| FREDIS FONSECA, JOSE HOLSENT | ) | |
| PEREZ, DONNIE RAYFIELD, ISRAEL | ) | ON APPEAL FROM THE UNITED |
| CARBALLEA, | ) | STATES DISTRICT COURT FOR |
|     Defendants-Appellants. | ) | THE EASTERN DISTRICT OF |
| | ) | TENNESSEE |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | **OPINION** |

_____

**BEFORE: KEITH and BATCHELDER, Circuit Judges; ALDRICH, District Judge.[*]**

**PER CURIAM.** Defendants-Appellants Fredis Fonseca ("Fonseca"), Israel Carballea

("Carballea"), Jose Holsent Perez ("Perez"), and Donnie Rayfield ("Rayfield") were charged with

conspiring to violate the drug laws by knowingly distributing more than 500 grams of a substance

containing methamphetamine, 500 grams or more of a substance containing powder cocaine, and

more than 50 kilograms of marijuana in violation of 21 U.S.C. §§ 841 and 846. Additionally,

Fonseca and Carballea were charged with conspiracy to commit money laundering in violation of

18 U.S.C. § 1956. Fonseca and Carballea pleaded guilty, while Perez and Rayfield went to trial.

---

[*] The Honorable Ann Aldrich, United States District Judge for the Northern District of Ohio,
sitting by designation.

The jury returned a verdict against Perez and Rayfield finding them guilty as charged.  The district court sentenced Fonseca to a concurrent term of 168 months imprisonment, Carballea to 195 months imprisonment, Perez to 121 months imprisonment, and Rayfield to 70 months imprisonment.  Both Perez and Rayfield appeal their convictions and the district court's sentencing determinations, while Fonseca and Carballea only appeal the district court's sentencing determinations.  For the following reasons, this Court **AFFIRMS** Perez's and Rayfield's convictions and the district court's sentencing determinations with regard to all of the Defendants.

## I.        BACKGROUND

### A.        Facts

This case involves a group of Cuban emigrants residing in the Dalton, Georgia, area who formed an illegal conspiracy to buy quantities of methamphetamine, cocaine, and marijuana from out-of-state sources for resale.  The conspiracy operated for approximately two years, from 2001 until the fall of 2003, when some of the co-conspirators were arrested.  This appeal involves four of the seventeen defendants that were charged and convicted.  The following summarizes the pertinent facts of the case.

### *Fonseca and Carballea's Offense Conduct*

Fonseca immigrated to the United States from Cuba in 1995.  In December 1999, after living in Florida and Alabama, Fonseca moved to Dalton, Georgia.  Carballea, a Cuban who lived in Dalton, developed a friendship with Fonseca.  In 2001, Fonseca and Carballea became partners in an extensive drug ring, which involved selling various quantities of methamphetamine, powder cocaine, and marijuana.  At trial, Fonseca admitted that when they were arrested in 2003, he had personally made over $250,000 selling methamphetamine.

In California, Fonseca and Carballea purchased methamphetamine from Emilio Barajas ("Barajas") in ten-pound increments for approximately $50,000. After Barajas was arrested, they purchased from another California source, Armando Alvarez. Fonseca and Carballea also purchased methamphetamine from other sources in California and Georgia. Fonseca would break the methamphetamine down and sell one pound for $8,000, a half-pound for $4,000, and a quarter-pound for $2,000.

Pedro Pablo Izquierdo ("Izquierdo"), Carlos Fernandez ("Fernandez"), and Gerardo Marrero ("Marrero") were drug couriers for Fonseca and Carballea. The couriers stored the methamphetamine at their residences; in exchange, Fonseca and Carballea paid half of their rent in addition to a weekly salary.

The operation of the business functioned as follows: Fonseca and Carballea would give a customer their cell phone numbers, the customer would call and place a drug order, Fonseca and Carballea would contact one of the couriers and advise where and how much to deliver, and the courier wold deliver the drugs to the customer. Fonseca or Carballea would collect the cash payment for the drug delivery at a later date or the customer would pay the courier upon delivery. Their customers were in the Dalton, Georgia, area and in Tennessee.

Ronnie Edwards ("Edwards") was one of Fonseca's regular customers who would also resell methamphetamine. Edwards would buy four ounces at time from Fonseca, valued at $1,800, and sell it for a profit of $500 to $600. One of Edwards' regular customers was Doug McDonald, who lived in Bradley County, Tennessee, and would drive to Georgia to pick up the methamphetamine.

Sterling Christopher Stewart ("Stewart") was another one of Fonseca's regular methamphetamine customers. Stewart lived in Cleveland, Tennessee. In his first deal with Fonseca,

Stewart came to Fonseca's apartment and purchased a half of a pound of methamphetamine for $4,000. Fonseca gave Stewart his phone number and thereafter Stewart would call and order his methamphetamine from Fonseca and then meet one of Fonseca's couriers to pick up the methamphetamine. This continued for about nineteen months with a four-month break when Stewart was arrested for possessing an ounce of methamphetamine. After his arrest, Stewart called Fonseca and told him that he needed to make some money and Fonseca gave him a pound of methamphetamine on credit. Subsequently, Stewart began buying a pound of methamphetamine from Fonseca every two weeks for $8,000. Stewart would meet Fonseca's couriers at various locations near the Tennessee and Georgia state line. In March 2003, Stewart was arrested in this case.

### Perez's Offense Conduct

In 1991, Defendant Perez met Fonseca in Alabama. When Fonseca moved to Dalton, Georgia, Fonseca opened a Mexican restaurant and a seafood restaurant. When Perez moved to Dalton, Fonseca hired him to manage the seafood restaurant. In 2002, the restaurant was not bringing in revenue, so Perez asked Fonseca if he could join the methamphetamine business. Initially, Fonseca gave Perez a pound of methamphetamine for $7,000 to sell.

Later, Perez began buying his methamphetamine from a source in Atlanta. When Perez's partner, whom Fonseca knew as Alvanito, was arrested, Perez began purchasing methamphetamine from Fonseca again. Perez introduced Fonseca to Luis Garcia ("Garcia") who also worked with Perez. Fonseca would send his couriers, Fernandes and Izquierdo, to deliver, on average, three pounds of methamphetamine to Garcia.

In 2001, Perez's customer, Shannon Roach ("Roach"), began purchasing and reselling methamphetamine on a weekly basis. This relationship lasted for over two years. Roach would take the cash to Perez from the previous transaction, Perez would call Roach shortly thereafter and tell Roach which of several prearranged locations would be used for delivery. Roach would pick up the methamphetamine from a courier, sell it, take the money to Perez, and start over. For the first eight or nine months, Antonio Valdez ("Valdez") delivered the methamphetamine to Roach. When Valdez was arrested, Fonseca's courier Carlos Fernandez delivered the methamphetamine to Roach. Roach was selling four or five ounces of methamphetamine per week.

### Rayfield's Offense Conduct

Another of Fonseca's regular methamphetamine customers was Billy Hyde ("Hyde"). Hyde purchased methamphetamine on a weekly basis from Fonseca for about a year prior to his arrest in September 2003. Hyde would call Fonseca and order four ounces a week, one of the couriers would take the methamphetamine to Hyde's residence, and Hyde would pay the courier in cash. The courier in turn would give the cash to Fonseca or Carballea.

At first, Hyde was selling methamphetamine to Ruth Rayfield ("Ruth"), who was a personal friend living in Cleveland, Tennessee. Ruth's brother in-law was Defendant-Appellant, Donnie Rayfield ("Rayfield"). Initially, Rayfield would use methamphetamine with Ruth, Hyde, and Hyde's wife, Amanda. For five or six months, Hyde would go to Ruth's residence in Cleveland, Tennessee, pick up the money, and deliver the methamphetamine. Alternatively, she would travel to Hyde's residence in Georgia.

During the six or seven months preceding his arrest in September 2003, Hyde was selling Rayfield three out of the four ounces he bought from Fonseca every week. Hyde paid Fonseca

$1,500 for four ounces and would sell three ounces to Rayfield for $2,000. Rayfield would drive from his residence in Cleveland, Tennessee to Hyde's residence, give Hyde the money, and often would be present when the courier delivered the methamphetamine to Hyde.

On one occasion, when Marrero delivered methamphetamine to Hyde, Rayfield answered the door and asked Marrero to wait while Hyde finished a phone call. To determine that Rayfield was knowledgeable about the drug exchange and trustworthy, Marrero took the package of methamphetamine, which was wrapped in a newspaper, and placed it on the table. Rayfield immediately took a piece of cloth from the couch and placed it on top of the package. Marrero then knew that Rayfield was aware that Hyde was buying methamphetamine.

On another occasion, Fonseca and Carballea went to Hyde's residence to inquire about Rayfield's vehicle. Rayfield wanted to sell the vehicle for a half pound of methamphetamine. Rayfield showed Fonseca and Carballea the vehicle and started it for them, but they were not interested in purchasing it. At trial, Hyde's wife testified that Rayfield was purchasing methamphetamine from Hyde on a weekly basis. She indicated that Rayfield would bring cash to Hyde's residence every couple of days. Hyde and Rayfield would count the cash, and Fonseca's courier would arrive to give Hyde a block of methamphetamine. Rayfield usually bought a couple of hundred dollars worth of methamphetamine and on occasion he bought an amount worth $2,000 to $3,000.

B. Procedural History

On September 23, 2003, a federal grand jury in the Eastern District of Tennessee returned a one-count indictment charging seventeen individuals, including Fonseca, Perez, and Carballea, with conspiring to violate the drug laws by knowingly distributing more than 500 grams of a

substance containing methamphetamine, 500 grams or more of a substance containing powder cocaine, and more than 50 kilograms of marijuana, in violation of 21 U.S.C. §§ 841 and 846. On October 28, 2003, the grand jury issued a superceding indictment charging Rayfield in the conspiracy offense, adding another count charging Fonseca and Carballea with money laundering, and adding a forfeiture allegation. On May 11, 2004, a second superceding indictment was returned, which added an additional defendant to the drug conspiracy charge.

All but three of the co-defendants pleaded guilty to count one, the conspiracy charge, pursuant to plea agreements with the Government. On May 25, 2004, Fonseca pleaded guilty pursuant to a plea agreement to both counts. On September 23, 2004, Carballea pleaded guilty to both counts without a plea agreement.

On September 28, 2004, co-defendants Roderick Scruggs ("Scruggs"), Perez, and Rayfield went to trial. After the United States rested its case in chief, the district court heard arguments on each Defendant's motion for judgment of acquittal and denied the motions. After arguments and the reading of the jury instructions, on October 20, 2004, the jury returned verdicts of guilty as to Perez and Rayfield and acquitted Scruggs.

On November 4, 2004, the United States filed a motion under seal for a downward departure for Fonseca and other cooperating Defendants based upon their substantial assistance to the United States. On November 8, 2004, the district court granted the Government's motion and sentenced Fonseca to concurrent terms of 168 months on his drug conspiracy and money laundering convictions. Fonseca filed a timely notice of appeal with this Court on November 22, 2004.

After trial, Perez was sentenced to 121 months. Perez filed a timely notice of appeal with this Court on February 3, 2005. Rayfield was sentenced to 70 months. He filed a timely notice of

appeal with this Court on February 11, 2005. Carballea was sentenced on February 14, 2005 to concurrent terms of 195 months on the drug conspiracy and money laundering convictions. He filed a timely notice of appeal with this Court on February 18, 2005.

## II. ANALYSIS

### A. Sufficiency of Evidence for Perez and Rayfield's Convictions

Perez and Rayfield contest the sufficiency of the evidence supporting their convictions for conspiring to distribute methamphetamine. "This Court reviews . . . a [sufficiency of evidence] challenge *de novo*, . . . but views the evidence in the light most favorable to the prosecution." *United States v. Owens*, 426 F.3d 800, 808 (6th Cir. 2005) (citing *United States v. Knipp*, 963 F.2d 839, 842 (6th Cir.1992); *United States v. Tocco*, 200 F.3d 401, 424 (6th Cir. 2000)). We review sufficiency of the evidence claims under a very deferential standard of review. *Id.* (citing *United States v. Spearman*, 186 F.3d 743, 746 (6th Cir.1999)). This Court will uphold a conviction as long as "a rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt." *Spearman*, 186 F.3d at 746. "'Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt.'" *Id.* (quoting *United States v. Vannerson*, 786 F.2d 221, 225 (6th Cir. 1986) (citing *United States v. Stone*, 748 F.2d 361 (6th Cir. 1984)).

In order to prove a conspiracy under 21 U.S.C. § 846, the United States was required to prove (1) an agreement to violate the drug laws, (2) knowledge and intent to join the conspiracy, and (3) participation in the conspiracy. *See United States v. Crozier*, 259 F.3d 503, 517 (6th Cir. 2001) (citing *United States v. Maliszewski*, 161 F.3d 992, 1006 (6th Cir. 1998)). The proof need not show a formal agreement; "'a tacit or material understanding among the parties' will suffice." *United*

*States v. Avery*, 128 F.3d 966, 970-71 (6th Cir. 1997) (quoting *United States v. Pearce*, 912 F.2d 159, 161 (6th Cir. 1990)).  In addition, the jury may infer the conspiracy's existence from circumstantial evidence that may reasonably be interpreted as participation in a common plan.  *Id*. at 971.

### 1.     Perez's Conviction

Perez argues that the evidence was not sufficient to support the jury's finding of a distributor relationship between himself and Fonseca.  He claims that the evidence only demonstrated a buyer-seller relationship.  He argues that this Court held in *United States v. Layne*, 192 F.3d 556 (6th Cir. 1999), that a buyer-seller relationship must be supplemented with additional evidence such as "repeat purchases or some other enduring arrangement that implies knowledge of the scope of the conspiracy."  Perez's Br. at 9.  Perez asserts that even though he purchased $7,000 worth of drugs from Fonseca on two separate occasions there is no evidence to show that he was involved in the further distribution of the drugs.  *Id*. at 10.

As detailed in the fact section, the record is replete with evidence that would support a rational jury's finding that Perez's relationship with Fonseca was more than just a buyer-seller relationship.  Perez was the manager of Fonseca's unprofitable seafood restaurant.  Perez then asked Fonseca if he could sell methamphetamine with him.  Further, Roach also testified that she purchased methamphetamine over a two year period from Perez.  Edwards, another defendant, also testified that he obtained methamphetamine from Perez.

Perez further argues that the jury should not have believed Fonseca's testimony as a co-conspirator who had an interest in cooperating with the Government.  This Court has repeatedly held that a juror is free to weigh the testimony of a co-conspirator who pleads guilty and testifies pursuant

to a cooperation agreement with the United States. *United States v. Burns*, 298 F.3d 523, 535 (6th Cir. 2002) (quoting *United States v. Hernandez*, 227 F.3d 686, 694 (6th Cir. 2000) (stating that "[s]ufficiency-of-the-evidence appeals are no place . . . for arguments regarding a government witness's lack of credibility")) (internal quotation marks omitted); *see also Spearman*, 186 F.3d at 746 (stating that "it is well-settled that uncorroborated testimony of an accomplice may support a conviction in federal court") (citations omitted). Overall, the facts above demonstrate that there was sufficient evidence from which a rational trier of fact could determine that Perez was involved in the conspiracy to distribute methamphetamine. Accordingly, we affirm Perez's conviction.

### 2. Rayfield's Conviction

Rayfield, like Perez, argues that he was simply a customer and not a dealer. He states that the evidence in this case only demonstrates that he purchased drugs to support his habit. He cites Hyde's testimony where Hyde admitted that he and Rayfield on numerous occasions smoked marijuana together as proof that he was only a customer. Appellant Rayfield's Br. at 14. Based on this evidence, Rayfield argues that "there is not a scintilla of evidence in the record that [he] ever distributed methamphetamine to anyone, or conspired with anyone else to distribute methamphetamine." *Id.* at 15.

The evidence on the record shows that Rayfield made weekly visits from Cleveland, Tennessee to Hyde's residence to purchase a half pound of methamphetamine. Police surveillance revealed that Rayfield's visits coincided with the arrival of Fonseca's courier delivery. In addition, there was evidence that Rayfield attempted to sell his car in exchange for a large quantity of methamphetamine. There was evidence that, on one occasion, when Fonseca's courier delivered methamphetamine to Hyde's home, Rayfield attempted to conceal the contents of the package,

demonstrating his knowledge of what was inside the package. This evidence supports the finding that there was sufficient evidence for the jury to find Rayfield guilty of conspiring to distribute methamphetamine. *Layne*, 192 F.3d at 568 ("additional evidence beyond the mere purchase or sale of drugs, such as evidence of repeat purchases or some enduring arrangement that implies knowledge of the scope of the conspiracy may support a conspiracy conviction.") (citations omitted).

Rayfield also argues that the Government's evidence was based on the testimony of a partial witness, Amanda Hyde, regarding the nature of the drug transactions. He asserts that Amanda Hyde testified to help her husband and ensure herself immunity. This Court has repeatedly held that it will not substitute its own judgment for that of the jury when weighing the credibility of a witness. *See, e.g., United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir. 1993) (recognizing that this Court does not weigh evidence, make credibility determinations or substitute its judgment for that of the jury); *United States v. Evans*, 883 F.2d 496, 501 (6th Cir. 1989) ("Issues of witness credibility . . . are strictly for the jury to determine.") (citation omitted). Accordingly, Rayfield's argument regarding Amanda Hyde's credibility does not provide sufficient evidence to overturn the jury's verdict. Thus, there was sufficient evidence to sustain Rayfield's conviction.

## B. Nexus to Interstate Commerce

Perez argues that the district court lacked jurisdiction because of his insufficient contacts in the Eastern District of Tennessee. Appellant Perez's Br. at 14. This Court has unequivocally held that "drug trafficking is an 'economic enterprise' that substantially affects interstate commerce in numerous clear ways" and is an "activity that the federal government clearly may regulate." *United States v. Tucker*, 90 F.3d 1135, 1140-41 (6th Cir. 1996); *see also United States v. McDougherty*, 920 F.2d 569 (9th Cir.1990), *cert. denied*, 499 U.S. 911 (1991) (stating that Congress has already

determined, and the courts have accepted as rational, that drug trafficking affects interstate commerce). The district court properly maintained jurisdiction over this case.

### C. Improper Venue

Rayfield argues that venue is improper in the Eastern District of Tennessee where the Government could not prove that a substantial act or acts in furtherance of the conspiracy took place in the Eastern District of Tennessee. This Court reviews *de novo* the district court's interpretation of the venue statutes, and reviews for abuse of discretion the court's decision whether to dismiss for lack of venue. *United States v. Brika*, 416 F.3d 514, 527 (6th Cir. 2005) (citing *Kerobo v. SW Clean Fuels, Corp.*, 285 F.3d 531, 533 (6th Cir. 2002)). "Venue is proper in the district where the crime was committed. *See* U.S. Const. Art. III, § 2, Cl. 3 ('Trial shall be held in the State where the said Crimes shall have been committed'); Fed. R. Crim. P. 18 ('[T]he prosecution shall be had in a district in which the offense was committed.')." *Id.*

Since venue is often appropriate in more than one district, this Circuit applies the substantial contacts test to determine the appropriate venue. *United States v. Williams*, 788 F.2d 1213, 1215 (6th Cir.1986). This test "takes into account a number of factors [including] the site of the defendant's acts, the elements and nature of the crime, the locus of the effect of the criminal conduct, and the suitability of each district for accurate fact finding." *Id.* at 1215 (quoting *United States v. Reed*, 773 F.2d 477, 481 (2d Cir. 1985)). In addition, 18 U.S.C. § 3237(a) instructs that "any offense against the United States begun in one district and completed in another . . . may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed."

Rayfield contends that venue is improper in Tennessee because all of the overt acts took place in Northern Georgia. Rayfield's argument is without merit. The district court properly found

that Rayfield is a Tennessee resident and one of several co-conspirators who transported methamphetamine to Tennessee after purchasing it from Fonseca in Georgia. Fonseca testified that he had drug customers in the Eastern District of Tennessee as well as numerous customers in Dalton, Georgia.

The record is replete with evidence that the overt acts in furtherance of the conspiracy took place in the Eastern District of Tennessee. Edwards bought methamphetamine from Fonseca every week for two years and one of Edwards' customers lived in Bradley, Tennessee. The customer, McDonald, like Rayfield, made weekly trips to Georgia to pick up his methamphetamine from Fonseca's couriers. Stewart also traveled from Cleveland, Tennessee to pick up methamphetamine from Fonseca. On at least one occasion, Roach and her father drove from Georgia through Tennessee to Kentucky to deliver methamphetamine to a relative. Numerous facts indicate that the district court did not abuse its discretion in concluding that venue in the Eastern District of Tennessee was proper.

### D.    Rayfield's Challenge to the Jury Instructions

#### 1.    Lesser Included Offense

Rayfield argues that the district court erred when it refused to instruct the jury on the lesser-included offense of conspiracy to possess methamphetamine and/or the lesser-included offense of simple possession of methamphetamine. This Court reviews the district court's propriety of the jury instructions for abuse of discretion. *United States v. Ursery*, 109 F.3d 1129, 1135 (6th Cir. 1997). Accordingly, this Court will not overturn jury instructions unless the district court's error was so objectionable that it should have been apparent to the trial judge. Fed. R. Crim. P. 18.

A lesser-included offense instruction is appropriate where: (1) the request is properly made; (2) the elements of the lesser offense are identical to parts of the elements of the greater offense; (3) there is evidence that would support conviction on the lesser offense; and (4) the proof on the element or elements differentiating the two crimes is sufficiently disputed such that the jury could consistently acquit on the greater offense and convict on the lesser. *United States v. Colon*, 268 F.3d 367, 373 (6th Cir. 2001) (citing *United States v. Monger*, 185 F.3d 574, 576 (6th Cir. 1999)).

Rayfield properly asked the district court to instruct the jury that the object of the conspiracy was "misdemeanor simple possession," in violation of 21 U.S.C. § 844(a) as opposed to "felony distribution" in violation of 21 U.S.C. § 846. Rayfield, however, cannot establish the other requirements that would entitle him to the lesser included offense. The elements of distribution of methamphetamine, cocaine, and marijuana are not identical to possession of methamphetamine. *See Colon*, 268 F.3d at 377 (holding that "the elements of simple possession are not identical to the elements of distribution of cocaine or of conspiracy to possess with intent to distribute or to distribute cocaine").

The Government correctly asserted that the jury would have to acquit Rayfield if it found him guilty of conspiracy to possess methamphetamine or simple possession because the elements required for distribution are different from possession. It would have been plain error for the district court to alter the grand jury's charge and instruct the jury with the conspiracy to possess or simple possession offense. The district court did not abuse its discretion.

### 2. Jury Instruction on Quantity of Drugs Over a Period of Time

Rayfield alleges that the district court committed plain error in instructing the jury that it could consider evidence showing that a person trafficked a large amount of drugs and engaged in

a series of drug transactions over a period of time as proof of a conspiracy.  At trial, Rayfield did not object to the Court's instruction on the quantity of drugs being proof of conspiracy to distribute. Accordingly, the standard of review is plain error. *United States v. King*, 169 F.3d 1035, 1040 (6th Cir. 1999) (citing *United States v. Wilkinson*, 26 F.3d 623, 625 (6th Cir.1994)).  "'An instruction is not plainly erroneous unless there was an egregious error, one that directly leads to a miscarriage of justice.'"  *Id*. (quoting *Wilkinson*, 26 F.3d at 625) (internal quotation marks omitted).

The district court instructed the jury that evidence showing that a person trafficked a large amount of drugs and engaged in a series of drug transactions may establish more than a buyer-seller relationship and may be considered proof of a conspiracy to distribute.  This Court has repeatedly held that persons trafficking large amounts of drugs and engaged in a series of drug transactions over a long period of time may establish more than a buyer-seller relationship.  *See United States v. Martinez*, 430 F.3d 317, 330-31 (6th Cir. 2005) (inference of agreement to participate in drug conspiracy may be based upon evidence of repeat purchases and large quantity of drugs); *United States v. Anderson*, 89 F.3d 1306, 1310 (6th Cir. 1996).

In this case, Rayfield bought three out of the four ounces that Fonseca sold to Hyde every week.  Hyde paid Fonseca $1,500 for four ounces and would sell three ounces to Rayfield for $2,000.  Further, Rayfield would drive from his residence in Cleveland, Tennessee to Hyde's residence to give Hyde the money.  Often, Rayfield was present when the courier delivered the methamphetamine to Hyde which permitted Rayfield to receive his three ounces immediately. Given the evidence in the case, the district court did not commit a plain error when it instructed the jury on the amount of Rayfield's drug quantity as evidence to establish the conspiracy.

E.    Sentencing

### 1.    Rayfield's Request for "Safety Valve" Provision

Rayfield argues that the district court erred when it refused to consider sentencing him pursuant to the safety valve provision. This Court reviews the district court's refusal to apply a safety value reduction for clear error. *United States v. Salgado*, 250 F.3d 438, 459 (6th Cir. 2001); *United States v. Adu*, 82 F.3d 119, 124 (6th Cir. 1996). The safety valve provisions, 18 U.S.C. § 3553(f) and United States Sentencing Guideline ("U.S.S.G." or "Guidelines") § 5C1.2(5), provide in pertinent part, that the defendant may be sentenced without regard to the applicable mandatory minimum sentence and may receive a two-level reduction in his offense level pursuant to U.S.S.G. § 2D1.1(b)(6) if, not later than the time of the sentencing hearing, "the defendant has truthfully provided to the government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan." § 3553(f)(5); § 5C1.2(5).

In this case, Rayfield did not truthfully provide the Government with information or evidence. Rayfield consistently disputed his involvement in the conspiracy. He continually alleged that he was not a dealer and only possessed methamphetamine. Under these circumstances, the district court properly denied his request for a reduction under the safety valve provision. *See Adu*, 82 F.3d at 125 (stating that "[w]here the government challenges a defendant's claim of complete and timely disclosure and the defendant does not produce evidence that demonstrates such disclosure, a district court's denial of a motion under § 3553(f) and § 5C1.2(5) is not clearly erroneous."). The district court did not err in refusing to apply the safety valve reduction to Rayfield's sentence.

### 2.    Reasonableness of Perez's and Rayfield's Sentences

Rayfield and Perez challenge the reasonableness of the district court's sentencing determinations. "When reviewing sentencing decisions, [this Court] review[s] the district court's factual findings for clear error, while reviewing the district court's conclusions of law *de novo*." *United States v. Hazelwood*, 398 F.3d 792, 795 (6th Cir. 2005). Where the district court applied advisory Guidelines, this Court reviews the selection of a sentence for reasonableness. *United States v. Jackson*, 408 F.3d 301, 305 (6th Cir. 2005); *see also United States v. Davis*, 397 F.3d 340, 346 (6th Cir. 2005) (stating that "[i]n a case such as this one, where Defendant contests the manner in which the district court applied the consulted Guideline, we are instructed to review the sentence for reasonableness."). Even if a sentencing error occurred, the Court will not remand if it decides the error was harmless. When the district court properly calculates the sentence under the Guidelines, a rebuttable presumption attaches that the sentence length is reasonable. *United States v. Williams*, 436 F.3d 706, 708 (6th Cir. 2006).

### a.      Rayfield's Sentence

Rayfield argues that his sentence was excessive and that the district court failed to consider the mandate of 18 U.S.C. § 3553(a)(6) by avoiding a sentencing disparity between him and his co-Defendants. Specifically, Rayfield argues that other co-defendants received minimal sentences of thirty-three months (Marrero, Fernandez, and Izquierdo) and fourteen months (Alvaro Santoyo, another co-Defendant in this case). Rayfield's argument lacks merit.

Rayfield's advisory Guideline range was 151 to 188 months. He was subject to a statutory minimum sentence of sixty months and a maximum of forty years. The other Defendants he compares himself to, Marrero, Fernandez, and Izquierdo, were sentenced after the Government filed § 5K1.1 downward departures based on their substantial assistance. As indicated above, Rayfield

has consistently disputed his involvement in the conspiracy and did not assist the Government. Based on the facts, he was not entitled to a similar departure.

When the district court sentenced Rayfield, it adequately considered the § 3553(a) factors. In support of its sentence, the district court cited Rayfield's lack of criminal history, the need to deter him from further crimes, the effect of dealing methamphetamine, and the need to be severe. The district court also required that Rayfield receive five hundred hours of drug treatment therapy. Since the district court's sentence was reasonable, we affirm Rayfield's sentence.

### b. Perez's Sentence

Perez's sentence was also reasonable. Perez contends that 121 months was unreasonable because his sentence was greater than necessary and there was excessive disparity between his sentence and the other co-Defendants. Perez further argues that a sentence of 75 months would have sufficiently addressed his conduct. Perez's mandatory minimum sentence under 21 U.S.C. § 841(b)(1)(A) was 120 months. His advisory Guideline range was 121 to 151 months. The district court stated that it considered the advisory Guideline range as "one factor among others to determine Mr. Perez's sentence." The district court discussed the drug quantity found by the jury and the seriousness of his offense. The district court noted that it imposed the sentence to promote respect for the law and felt that Perez should receive treatment for substance abuse. Perez failed to present any evidence that the district court's sentence was unreasonable. We therefore affirm Perez's sentence.

### 3. Carballea's Sentence

Carballea argues that the district court erred in considering the hearsay testimony of a law enforcement agent when determining the drug amount used to determine his advisory Guidelines

range. This argument was not clearly articulated in Carballea's brief. The Government construed his argument as asserting that the district court improperly engaged in judicial fact-finding in accepting the agent's hearsay testimony in violation of the Sixth Amendment. Appellee's Br. at 51.

At the sentencing hearing, the law enforcement officer testified to the drug quantity based on Carballea's guilty pleas. The officer also testified that Carballea and Fonseca were equal partners in the drug conspiracy and described evidence of their drug trafficking. After the law enforcement agent testified, the district court found by a preponderance of the evidence that the drug quantity was approximately twenty pounds.

There was no Sixth Amendment violation. This Court has conclusively held that *Booker* does not forbid all judicial fact-finding. "[P]ost-*Booker*, judges may enhance sentences based upon facts not found by the jury, provided they do not consider themselves required to do so." *Davis*, 397 F.3d at 352 (Cook, J., concurring). In addition, the district court did not err in using the officer's testimony to support Carballea's advisory range. The officer's testimony was based, in part, on the plea agreement. The district court's finding that the drug amount was twenty pounds was not clearly erroneous. Further, Carballea's sentence was reasonable as the judge also properly considered § 3553(a) factors in sentencing Carballea, stating that he should not receive a sentence higher than that given to the co-leaders of the conspiracy.

Carballea's argument that the agent's testimony is inadmissable hearsay also fails. This Court has held that hearsay is admissible in sentencing hearings as long as it bears some indicia of reliability. *United States v. Silverman*, 976 F.2d 1502, 1513-14 (6th Cir. 1992) (en banc) *cert. denied*, 507 U.S. 990 (1993). *See also United States v. Stone*, 432 F.3d 651 (6th Cir. 2005). Here, the officer's testimony was supported by Carballea's own plea as to the drug quantity. The district

court properly considered the agent's testimony regarding the drug quantity. Therefore, we affirm Carballea's sentence.

**F.      Jurisdiction over Fonseca's Failure to File a Rule 35(b) Motion and Downward Departure**

Fonseca argues that his sentence is unreasonable because the district court failed to "take into account the true remorse and substantial cooperation [he] displayed . . . ." Appellant Fonseca's Br. at 10. He also asserts that the United States failed to file a Rule 35(b) motion based on his cooperation. We reject both arguments.

The Government filed a motion for downward departure pursuant to U.S.S.G. § 5K1.1 based upon Fonseca's substantial assistance. After the downward departure, the district court sentenced him to 168 months. The district court has unfettered discretion to determine the extent of a downward departure based upon substantial assistance. *United States v. Jones*, 417 F.3d 547, 550 (6th Cir. 2005) (stating that the extent of a district court's departure after it grants a § 5K1.1 motion is an issue "entirely committed to the district judge's discretion;" this Court has no jurisdiction to review). Since *Jones* is the controlling authority on this issue, this Court does not have jurisdiction to review a district court's discretionary denial of a further downward departure for substantial assistance.

Fonseca's Rule 35(b) challenge also fails. Rule 35(b)(1) provides that within one year of sentencing, "[u]pon the government's motion . . . the court may reduce a sentence if: (A) the defendant, after sentencing, provided substantial assistance in investigating or prosecuting another person[.]" Fed. R. Crim. P. § 35(b)(1)(A). The Government, however, did not file a Rule 35(b) motion, thus no such relief is available to Fonseca. *United States v. Monus*, 356 F.3d 714, 718 n.4 (6th Cir. 2004) (stating that defendant's request for sentencing relief based upon Rule 35(b) is

"wholly without merit" since under the plain language of the Rule only the United States can file such a motion, absent a "substantial threshold showing" of unconstitutional motive for the government's refusal to make the motion). We affirm Fonseca's sentence.

## III. CONCLUSION

Based on the above analysis, this Court **AFFIRMS** the district court's decision to uphold the jury verdict against Perez and Rayfield and its sentencing determination as to all the Defendants.

**ALICE M. BATCHELDER**.  I concur in the result that this opinion reaches as to each defendant.  With regard to defendant Rayfield, I do not believe that the evidence cited in the opinion is sufficient to support the conviction for conspiracy to distribute methamphetamine, but I would affirm the conspiracy conviction because, in addition to that evidence, there is evidence in the record that Billy Hyde fronted methamphetamine to Rayfield, who paid Hyde for the drugs later, and that Rayfield purchased methamphetamine in amounts that are not commensurate with personal use.  With regard to defendant Perez, I would note that Perez did not raise before the district court the commerce clause argument he makes on appeal.